IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHINA NATIONAL CHEMICAL
CONSTRUCTION CHONGQING Co., and
CHONGQING  PESTICIDE                                          CV-05-350-ST
CHEMINDUSTRY (GROUP) CORP.,
                                                             FINDINGS AND
                    Petitioners,                             RECOMMENDATION

        v.

SEEDLING, WORLDMODAL NETWORK
SERVICES, and KIT KUNG,

_____Respondents._____

STEWART, Magistrate Judge:

## **INTRODUCTION**

Pursuant to 9 USC § 207, petitioners, China National Chemical Construction Chongqing

Co. ("Chongqing Chemical") and Chongqing Pesticide Chemindustry Corp. ("Chongqing

Pesticide"), both organized and existing under the law of the People's Republic of China, seek an

order confirming a foreign arbitral award entered against Seedling,[1] a dissolved corporation with its principal place of business in Portland, Oregon, Worldmodal Network Services, a dissolved corporation with its principal place of business in Portland, Oregon, and Kit Kung ("Kung"), a United States citizen residing in the state of New Jersey.

This proceeding arises under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 UST 2517 ("Convention"). The United States ratified the Convention and Congress enacted implementing legislation in 1970, 9 USC §§ 201-208. The People's Republic of China is a party to the Convention. Petitioners allege that this court has jurisdiction under 9 USC § 203. Respondent Kung denies that the court has jurisdiction under 9 USC § 203 or § 207 and alleges 17 affirmative defenses, including lack of personal jurisdiction.

Kung has filed a Motion to Dismiss Petition (docket #17) on the grounds that: (1) the court lacks personal jurisdiction over him; (2) the Petition fails to state a claim upon which relief can be granted because it is defective; and (3) he is not a party to any agreement to arbitrate. For the reasons set forth below, Kung's motion should be granted based on the lack of personal jurisdiction.

## ALLEGATIONS

On April 15, 1994, petitioners signed a contract with Brighton Industries Corporation ("Brighton Industries") to purchase chemical equipment for $11 million. Petition, ¶ VIII. Under

---

[1] Seedling does not seem to be a complete name for this corporation. Instead, it either is Seedling Technologies Corporation, Seedling Technology Ventures, Inc., or Seedling, Inc. *See* Baolin Chen's Affidavit attached to Petitioners' Reply Memorandum in Response to Kit Kung's Motion for Protective Order and Kit Kung's Response to Petitioners' Motion to Compel, Exhibit 5 (Counterclaims of Defendants and Counterclaims filed in *Seedling Technologies Corp. v. Kung*, Superior Court of New Jersey Law Division: Bergen County, Docket No. BER-L-2588-01).

the contract, Brighton Industries applied for a loan of $6,000,050 on behalf of petitioners from the American Import and Export Bank. *Id*. The loan was to be guaranteed by Chinese Construction Bank and to be registered with the Chinese National Foreign Currency Management Administration. *Id*. On August 15, 1996, petitioners and Brighton Industries signed a Supplementary Agreement stating that petitioners would only purchase the equipment in the United States in the amount of $3.6 million *Id*, ¶ IX. As a result, Brighton Industries obtained more funds than needed to purchase the equipment.

On November 1, 1999, petitioners signed a Refund Agreement with Brighton Industries, Beijing Brighton Systems Corporation and Brighton Technologies [Corporation] ("Brighton Technologies"). In this agreement, the parties confirmed that Brighton Industries still had $2.45 million in its bank account which was owed to petitioners. *Id*, ¶ X. Brighton Industries, Beijing Brighton Systems Corporation and Brighton Technologies guaranteed that the amount would be returned to petitioners. *Id.*

After that, Kung signed a promissory note guaranteeing that Brighton Industries would return $2.45 million to petitioners and also committed his stocks in Brighton Technologies as collateral. *Id*, ¶ XI.

On April 12, 2001, petitioners filed an arbitration provision with China International Economic Trade Arbitration Commission ("CIETAC"). *Id*, ¶ XII. Hearings were held in Beijing, China, at which both parties' representatives appeared. *Id*. On March 11, 2002, the tribunal of the Arbitration Commission made and delivered a written award ordering Bright Industries, Brighton Technologies, and Kit Kung to pay more than $3 million. *Id*.

Seedling [Technologies Corporation] and Worldmodal Network Services later became

the successor companies of Brighton Industries and Brighton Technologies. *Id*, ¶ XIII.

## DISCUSSION

### I.  Personal Jurisdiction

Absent jurisdiction, this court cannot address the merits of any other basis for dismissal

of this case. Therefore, it will first address Kung's argument that this court lacks personal

jurisdiction over him.

### A.  Legal Standard

As was recognized by the Ninth Circuit in *Glencore Grain Rotterdam B.V. v. Shivnath*

*Rai Harnarain Co.*, 284 F3d 1114, 1119-20 (9th Cir 2002), United States district courts have

original jurisdiction over actions or proceedings falling under the Convention. While the

Convention gives district courts subject matter jurisdiction to enforce an award rendered pursuant

to its terms in a country which was a party to the Convention, it does not eliminate the due

process requirement that a federal court have jurisdiction over a defendant's person or property in

a suit to confirm a previously issued arbitration award. *Id.* Where personal or *in rem* jurisdiction

is lacking, it is proper for the district court to dismiss the complaint to enforce a foreign arbitral

award. *Id.*

The plaintiff bears the burden of establishing personal jurisdiction over the defendant.

*Ballard v. Savage*, 65 F3d 1495, 1498 (9th Cir 1995) (citations omitted); *Rano v. Sipa Press, Inc.*,

987 F2d 580, 587 (9th Cir 1993), citing *Data Disc, Inc. v. Systems Tech. Assocs., Inc.*, 557 F2d

1280, 1285 (9th Cir 1977). When a court does not conduct an evidentiary hearing, but makes its

jurisdictional decision based on pleadings and affidavits, the plaintiff is required merely to make

a *prima facie* showing of personal jurisdiction to defeat a motion to dismiss. *Data Disc*, 557 F2d at 1285. That is, plaintiff need only demonstrate facts that if true, would support jurisdiction over the defendant. *Ballard*, 65 F3d at 1498.

The power of a federal court to hear a case where a defendant claims a lack of personal jurisdiction in a diversity action depends on two independent considerations. First, applicable state law must purport to confer personal jurisdiction over the defendant. *See* ORCP 4. Second, the assertion of personal jurisdiction must comport with constitutional principles of due process. *See Int'l Shoe Co. v. Washington*, 326 US 310, 319 (1945). Where, as in Oregon, the state and federal limits are coextensive, *State ex rel. Hydraulic Servocontrols, Inc. v. Dale*, 294 Or 381, 384, 657 P2d 211, 212-13 (1982), the court must determine whether the exercise of jurisdiction comports with federal constitutional principles of due process.

B.    **Analysis**

The Supreme Court has identified two forms of personal jurisdiction, "general" and "specific" (or "limited"). *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 US 408, 415 n8 & n9 (1984). Petitioners contend this court has general jurisdiction or, alternatively, specific jurisdiction over Kung. Both are premised on the extent of Kung's contacts with Oregon.

1.    **Kung's Contacts with Oregon**

Kung had no business contacts with Oregon until 2000 when he became involved in a "reverse merger" of Brighton Technologies with an Oregon corporation. He owned approximately 2.7 million shares of Brighton Technologies and served as its Chairman of the Board, President and CEO from approximately July 1996 to early November 2000. Declaration of Patrick J. Monaghan, Jr. ("Monaghan Decl."), Ex. B (Answers to First Set of Interrogatories to

Kit Kung by Petitioners), p. 2 . Brighton Technologies was a holding company involved in buying and selling western technologies and products and selling the same to Chinese markets. *Id* at 3; Declaration of Kit Kung ("Kung Decl."), ¶ 6. By the time period relevant to this case, the only asset of Brighton Technologies was Brighton Electronics Corporation which, in turn, was a holding company owning a minority interest in a Chinese company, Beijing Brighton STAQ Electronic Systems Co, Ltd.[2] Petitioners' Reply Memorandum in Response to Kit Kung's Motion for Protective Order and Kit Kung's Response to Petitioners' Motion to Compel ("Petitioners' Reply"), Ex. 4, p. 000131; Petitioners' Motion to Compel, Ex. 2, p. 4. After the Asian financial crash in 1997, the Board decided to look for a buyer in the second half of 2000. Monaghan Decl., Ex. B, p. 2.[3]

In August 2000, Kung was approached by Douglas Spink ("Spink") and Paul Peterson ("Peterson"), who then resided in Oregon and were Chairman and President respectively of Seedling Technology Ventures Incorporated ("Seedling TVI"), a private investment company incorporated and doing business in e-commerce in Oregon. Kung Decl., ¶ 7; Petitioners' Reply, Ex. 4, pp. 000154-55; Petitioner's Motion to Compel, Ex. 7 (Form 8-K, p. 1). Spink and Peterson expressed interested in transforming Seedling TVI into a publicly traded company by merging Seedling TVI, a non-public company, into Brighton Technologies, a public company (a procedure known as a reverse merger). Kung Decl., ¶ 8. Seedling TVI also was interested in a joint venture opportunity involving Easi-Link in which Kung wanted Seedling to invest $1

---

[2] Kung's wife, Hong Yun, founded Brighton Industries in 1989. Petitioners' Motion to Compel, Ex. 2, p. 36. Brighton Industries became a subsidiary of Brighton Technologies, but was sold in 1999 to GIS Worldtrade Corporation Limited and was not part of the subsequent merger. *Id*, p. 18.

[3] Kung apparently spent $300,000 personally in 1999-2000 "to take the company alive." Petitioner's Reply, Ex. 4, p. 000105.

million. Petitioners' Reply, Ex. 4, pp. 000157, 000192, 000204, 000207. After exchanging correspondence and e-mails, Kung met with Spink and Peterson in Oregon on September 7, 2000, in order to discuss the possible merger. Kung Decl., ¶ 8. The next day on September 8, 2000, in connection with the activities of Brighton Technologies, including fund-raising, Kung paid a social visit on a friend at his home and also met a man at his home in Oregon for approximately three hours. *Id*, ¶ 15; Monaghan Decl., Ex. C, p. 2 (Amended Answer to Interrogatory No. 5).

The parties then executed a short-form agreement for the merger subject to the approval of the investors. Kung Decl., ¶ 8. That agreement required Kung personally to indemnify and hold Seedling TVI harmless for the debts of Brighton Technologies arising out of its past operations,[4] secured by a pledge of Kung's stock in Brighton Technologies for a period of 12 months. Petitioners' Reply, Ex. 4, pp. 000076-77 (¶ 7). It also required Kung to sign a Lock-Up Agreement not to pledge or convey 90% of his shares for 18 months. *Id* (¶ 8). The completion of the merger involved numerous communications by mail, email and facsimile from Kung in New Jersey to Seedling TVI in Oregon. Petitioners' Reply, Ex. 4. After approval by the shareholders of Brighton Technologies, with Kung abstaining, the merger was completed on November 3, 2000. *Id*, pp. 000188-89; Petitioner's Motion to Compel, Ex. 7 (Form 8-K), p. 2. As a result of the merger, Seedling TVI owned about 85% of all outstanding shares and the former shareholders of Brighton Technologies owned about 15% of all outstanding shares of the newly established company. Monaghan Decl., Ex. B, p. 4. Kung surrendered his former titles of

---

[4] Contrary to petitioners' argument, Kung did not agree to defend Seedling Technologies.

president and CEO at Brighton Technologies on the date of the merger (November 3, 2000), but remained a member of the Board of Directors of the merged company until either November 20 or December 15, 2000, when he resigned from that position as well. Petitioners' Reply, Ex. 4, pp. 000093, 000112 (offer of resignation as director accepted), 000115; Petitioner's Motion to Compel, Exs 6 (Answer to Interrogatory No. 7) & 7 (Form 8-K, ¶ 5.10 & p. 33).[5] He continued to own the same number of shares of Brighton Technologies prior to and after the merger. Monaghan Decl., Ex. B, p. 8.

The merger was disclosed in a Form 8-K dated November 3, 2000, and filed on March 1, 2001, with the Securities and Exchange Commission. Petitioner's Motion to Compel, Ex. 7. Spink, Peterson, and Seedling TVI changed the location of Brighton Technologies' corporate offices from New Jersey to Oregon and changed the corporate name of the merged company to Seedling Technologies Corporation ("Seedling Technologies"). Kung Decl., ¶ 10. At some unspecified time, Seedling Technologies later changed its name to Worldmodal Network Services. *Id*, ¶ 14.

Having retained a substantial interest in the merged company, Kung hoped it would be successful under Spink's and Peterson's stewardship. *Id*, ¶ 11. Seedling Technologies also expressed an interest in getting the company back on track and growing. Petitioner's Reply, Ex. 4, p. 000105. However, Seedling Technologies almost immediately breached the merger agreement by, among other things, failing to pay about $100,000 in past due wages to employees

---

[5] Although Kung contends that he resigned as a director on November 3, 2000, the only evidence he has submitted is a statement by his attorney that his interrogatory answer "was incorrect." Further Supplemental Declaration of Patrick J. Monaghan, Jr., Esq. in Support of Respondent, Kit Kung's Motion for a Protective Order, ¶ 7. This evidence is hearsay and not admissible. Furthermore, it is belied by the other documents in the record.

and about another $100,000 in professional fees as agreed. *Id*. In addition, the value of the stock price fell. Prior to the merger, the stock price of Brighton Technologies fluctuated between $1.25 to $1.75 per share; after the merger, the price of Seedling Technologies's shares fell to about $1.00 per share for a period of four to six months and later to about $0.10 per share. Monaghan Decl., Ex. B, p. 4.

A dispute arose, followed by a race to the courthouse, with Spink and Seedling Technologies first filing a lawsuit in New Jersey on March 28, 2001. Petitioners' Motion to Compel, Ex. 8; Kung Decl., ¶ 11. Kung and the other defendants responded by filing counterclaims. Kung Decl., ¶ 12. The claims by Spink and Seedling Technologies were later dismissed on defendants' motion, and a trial was held on the defendants' damages claims. *Id*. At a full-day hearing, Kung proved the value of his losses based on the value of the Brighton Technologies stock at the time of the merger. *Id*. As a result, on November 19, 2002, defendants, including Kung, obtained judgment of about $4.7 million against Seedling Technologies, Worldmodal Network Services, Inc., Spink and Peterson. *Id*; Petitioners' Motion to Compel, Ex. 8.

In December 2002, Kung's attorneys filed the New Jersey judgment in Oregon in an effort to collect it against the judgment debtors in Oregon. Kung Decl., ¶ 13 (*Kit Kung et al v. Seedling Technology Ventures, et al,* Circuit Court of the State of Oregon, Multnomah County, Case. No. 0212-12940); Petitioners' Motion to Compel, Exs. 8 & 9. His attorneys later filed involuntary bankruptcy proceedings in Oregon against the judgment debtors. Kung Decl. ¶ 13; (*In re Douglas Spink*, United States Bankruptcy Court for the District of Oregon, No. 03-38352;

and *In re Paul Peterson*, United States Bankruptcy Court for the District of Oregon, No. 03-38353).[6] So far, none of these proceedings has been successful in obtaining any recovery. *Id.*

After the arbitration tribunal issued its award dated March 11, 2002, ordering Kung to pay more than $3 million, Kung and Beijing Brighton STAQ Electronic Systems Co. Ltd. (by then known as Brighton Easi-Link Information Technology Co. Ltd.) filed a petition with a Chinese court to vacate the award. Petitioners' Motion to Compel, Ex. 5 (Hong Zhang Affidavit) ¶ 8. The court rejected that attempt on November 18, 2002. *Id.* Later, petitioners tried to enforce the arbitration award against Kung and his corporations in China. *Id*, ¶ 9. They discovered that Kung closed the Beijing Branch of Brighton Industries and started a new business called Beijing Branch of Brighton Equipment Corporation in the same location by simply changing the office sign on the outside wall. *Id.* Beijing Brighton STAQ Electronic Systems Co. Ltd. (or Brighton Easi-Link Information Technology Co. Ltd.), previously at the same location, also was gone. *Id.* Kung and his wife became President and manager of Brighton Equipment Corporation and refused to honor the arbitration award. *Id.* When petitioners tried to sell Kung's pledged stock in Brighton Technologies, it proved to be worthless. *Id*, ¶ 10.

## 2. General Jurisdiction

General jurisdiction exists if the nonresident's contacts with the forum state, even if unrelated to the nonresident's activities in the states, are continuous and systematic, and the exercise of jurisdiction satisfies traditional notions of fair play and substantial justice. *Reebok*

---

[6] The record does not reveal whether either Seedling Technologies or Worldmodal Network Services is still in bankruptcy. If so, then the Petition is subject to the automatic stay of the Bankruptcy Court. Although served, neither entity has filed an appearance.

*Int'l Ltd. v. McLaughlin,* 49 F3d 1387, 1391 (9th Cir), *cert denied*, 516 US 908 (1995), citing

*Core-Vent Corp. v. Nobel Indus. AB*, 11 F3d 1482, 1485 (9th Cir 1993).

Kung did not have the "continuous and systematic" contacts with Oregon that would support the exercise of general personal jurisdiction over him in this forum. Kung is a resident of New Jersey and personally came to Oregon only once in August 2000. He also had other communications by emails, faxes and letters as a representative of Brighton Technologies to complete the merger with persons in Oregon through November 2000. After the merger was completed, he had periodic communications with the merged company over the next few months concerning breach of the merger agreement and, through his attorneys, has attempted to collect the New Jersey judgment against the judgment debtors in Oregon.

Nothing indicates that Kung ever had bank accounts, or real or personal property in Oregon, was registered to conduct business in Oregon, or otherwise had any other contact with this state unrelated to one limited business venture. In short, Kung's contacts with Oregon, although important in the context of the business relationship between Brighton Technologies and Seeding TVI, were insufficiently continuous and systematic to subject Kung to general personal jurisdiction in Oregon.

Even if Kung was acting on his own behalf, his contacts with Oregon occurred over a limited period of time for one purpose only: to complete a merger of his company with an Oregon company and to enforce its terms. This is a far cry from a nonresident having employees, bank accounts, directors' meetings and other significant corporate activity in the forum state. *See Perkins v. Benguet Consol. Mining Co.*, 342 US 437, 445 (1952); *Michigan Nat'l Bank v. Quality Dinette, Inc.*, 888 F2d 462, 466 (6th Cir 1989).

Kung's contacts with Oregon do not come close to establishing general jurisdiction. Accordingly, to survive dismissal, petitioners must show that this court may properly exercise specific personal jurisdiction over Kung.

### 3.    Specific Jurisdiction

A court has specific jurisdiction over a non-resident whose contacts with the state are not substantial if the plaintiff's cause of action arises out of the defendant's forum-related activities. *Haisten v. Grass Valley Med. Reimbursement Fund*, 784 F2d 1392, 1397 (9th Cir 1986). Specific jurisdiction is determined by a three part test: (1) the nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum state; (2) the claim must be one arising out of or relating to the defendant's forum related activities; and (3) the exercise of jurisdiction must be reasonable. *Panavision Int'l, LP v. Toeppen*, 141 F3d 1316, 1320 (9th Cir 1998); *Ballard*, 65 F3d at 1498.

### a.    Purposeful Availment

A party "purposefully avails" itself of the privilege of conducting activities in a forum state if it directs its activities at the residents of the forum state. *Burger King Corp. v. Rudzewicz*, 471 US 462, 475 (1985). Purposeful availment is shown "if the defendant has taken deliberate action within the forum state or if he has created continuing obligations to forum residents." *Ballard*, 65 F3d at 1498 (citations omitted). Although contacts that are "isolated" or "sporadic" may support specific jurisdiction if they create a "substantial connection" with the forum, the contacts must be more than random, fortuitous, or attenuated. *Burger King*, 471 US at 475. A defendant need not be physically present within the forum, provided its efforts are

purposefully directed toward forum residents.  *Id* at 476.  However, contacts resulting from the "unilateral activity of another party or third person" are not attributable to a defendant.  *Id* at 475 & n17.  With respect to a contract entered into with a forum corporation, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" are factors to be considered.  *Id* at 479.

Kung argues that he has not purposefully availed himself of conducting activities in Oregon because his activities in Oregon with respect to the merger were allegedly conducted in a representative capacity on behalf of Brighton Technologies, not by himself as an individual.

To rebut this argument, petitioners seek further discovery in order to pierce the corporate veil of Brighton Technologies with regard to Kung.  Under the "piercing the corporate veil" doctrine, "if the corporation is [the shareholder's] alter ego, its contacts are his and due process is satisfied."  *Rice v. Oriental Fireworks Co.*, 75 Or App 627, 632, 707 P2d 1250, 1255 (1985). Even if the corporate veil is not pierced, petitioners point out that Kung signed two agreements (the Lock-Up Agreement and agreement to indemnify) in his individual capacity in connection with the merger.

For purposes of this motion, this court assumes, without deciding, that petitioners can pierce the corporate veil from Brighton Technologies to Kung.  While Kung's acts both on behalf of Brighton Technologies in Oregon and himself arguably meet the purposeful availment requirement, they fail to satisfy the test for specific personal jurisdiction because they do not satisfy the second or third prongs of that analysis, as discussed below.

//

//

### b.    <u>Arising out of or Related to Activities in Oregon</u>

A claim arises out of a defendant's forum-related activities if the plaintiff would not have a cause of action "but for" the defendant's contacts with the forum.  *Doe v. American Nat'l Red Cross*, 112 F3d 1048, 1051 n7 (9th Cir 1997); *Zeigler v. Indian River County*, 64 F3d 470, 474 (9th Cir 1995) (citations omitted).  Kung argues that petitioners' claim arises out of Brighton Technologies' activities in China in 1994 and 1999, not out of any transaction or activity by Kung in his individual or representative capacity in Oregon regarding the merger.

Petitioners respond that Kung came to Portland, Oregon, to negotiate the merger between Brighton Technologies and Seedling Technologies in order to defraud them.  They contend that Kung's contact with Oregon was part of a clever scheme to avoid his debt incurred to them in 1999 by making Brighton Technologies and its stock disappear.  Through Brighton Industries, he first obtained $2.45 million more than needed in loans which neither he nor Brighton Industries would have to repay.  When pushed to sign the Refund Agreement and Promissory Note on November 1, 1999, he made Brighton Technologies the guarantor and also pledged his stock in Brighton Technologies.  Shortly thereafter in August 2000, he traveled to Oregon to personally negotiate the merger between Brighton Technologies and Seedling TVI, culminating in the reverse merger on November 3, 2000, when Brighton Technologies cased to exist.  He then continued business in China through Brighton Equipment Corporation in the same location.

Petitioners do not know what happened to the $2.45 million.  By following the loan proceeds, they hope to show that Kung or his family received that money which they pocketed, while at the same time using the merger to render valueless the stock of Brighton Technologies which secured Kung's promissory note.  In other words, Kung planned for Seedling

Technologies to go out of business by transferring a liability of Brighton Technologies, but not the asset to pay the liability, to the new merged company.[7] Therefore, until they obtain further discovery following the money from the original loan in 1994, they contend that Kung's motion to dismiss is premature.

However, the record fails to reveal that the merger between Brighton Technologies and Seedling TVI had anything to do with the arbitration award which petitioners are seeking to confirm. Although the merger occurred about a year after the Refund Agreement, it occurred about six months before any arbitration proceedings began in China. Moreover, from all indications in the record, Kung completed the merger with Seedling TVI in an effort to the value of his shares in Brighton Technologies. When the merged company failed to comply with its financial obligations, Kung sued and won a judgment for the loss in value of his shares which he has been attempting to enforce. Since those shares included the pledged shares which Kung had delivered to petitioners, Kung's attempt to recover the value of the shares actually benefitted petitioners. Kung surely would not have countersued Seedling Technologies had his motive been to render his shares valueless as theorized by petitioners.

Clearly Seedling TVI could invoke Kung's contacts to sue Kung in Oregon for misconduct related to the merger, and *vice versa*. However, petitioners have not filed a fraud claim against Kung. Instead, they only seek to confirm the arbitration award. The only relationship between the merger and the arbitration award is a potential difficulty in collecting

---

[7] It appears that prior to the merger, Brighton Technologies publicly disclosed the excess loan proceeds. The 10K Annual Report for Brighton Technologies for the period ended December 31, 1998, discussed the China National Project and said: "In addition, a deposit payable to the China National of $2,150,000 was outstanding at December 31, 1997 and 1998, which is classified as customer deposits in the consolidated balance sheet." Petitioners' Motion to Compel, Ex. 2, pp. 63-64.

the award after it is confirmed because Brighton Technologies merged into Seedling TVI and the merged company of Seeding Technologies is now defunct.

Petitioners' burden is to demonstrate facts which, if true, would support personal jurisdiction. The facts may be sufficient to establish personal jurisdiction over Kung for a fraud claim. However, it cannot be said that petitioners would not have a cause of action to confirm the arbitration award "but for" Kung's contacts with Oregon. To the contrary, they have a cause of action to confirm the arbitration award regardless of Kung's contacts with Oregon.

### c.    Reasonableness

Finally, Kung argues that it would be unreasonable to exercise jurisdiction over him in Oregon as he is a New Jersey resident with no ties to Oregon other than the one meeting in Oregon relating to the merger.

In determining the third requirement of reasonableness, the court must weigh the following factors:  (1) extent of defendants' purposeful injection into the forum; (2) defendants' burden from litigating in the forum; (3) extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy;  (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and  (7) the existence of an alternative forum. *Theo H. Davies & Co. v. Republic of the Marshall Islands*, 174 F3d 969, 975 n4 (9th Cir 1999) (citation omitted); *Terracom v. Valley Nat'l Bank*, 49 F3d 555, 561 (9th Cir 1995) (citations omited).  No single factor is dispositive.  *Terracom*, 49 F3d at 561.

Petitioners contend that it would not be burdensome for Kung to defend himself in Oregon as he has filed several suits here.  In addition, Oregon law would not conflict with the

law of New Jersey. Absent personal jurisdiction in Oregon over Kung, petitioners would have to file two lawsuits to confirm the arbitration award: one in Oregon against Seedling Technologies and its successor and a second in New Jersey against Kung.

Although these points are well-taken, it also is true that Kung's lawsuits in Oregon have not required his personal presence in Oregon. Instead, he hired an attorney in Oregon who filed the lawsuits in Oregon on his behalf to collect the New Jersey judgment. The record does not reveal that Kung ever came to Oregon in connection with those lawsuits. In contrast, to defend this case, he likely would have to travel to Oregon from New Jersey for the purpose of depositions and/or trial. Furthermore, Oregon has no interest in adjudicating this dispute, and any judgment awarded in Oregon against Kung would have to be recorded and executed in New Jersey.

On balance, it is equally convenient and efficient for petitioners to seek relief in New Jersey, an alternative forum which would be far less burdensome to Kung. Therefore, petitioners have not met their burden that exercise of personal jurisdiction over Kung in Oregon is reasonable.

### 4.    Conclusion

Because this court lacks personal jurisdiction over Kit Kung, the claims against him should be dismissed. However, even if this court does have personal jurisdiction, Kit Kung has raised several other issues which allegedly support dismissal. Should the district court not adopt this court's recommendation to dismiss for lack of personal jurisdiction, these issues will need to be resolved. Therefore, this court will address them.

///

## II.    Failure to State a Claim Due to Non-Compliance with Article IV

Kung contends that this case should be dismissed because petitioners failed to comply with the three requirements of Article IV of the Convention.  Article IV of the Convention requires that:

> 1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application, supply:
> (a) The duly authenticated original award or a duly certified copy thereof;
> (b) The original agreement referred to in article II [agreement re arbitrability of the dispute] or a duly certified copy thereof.
> 2. If the said award or agreement is not made in an official language of the country in which the award is relied upon, the party applying for recognition and enforcement of the award shall produce a translation of these documents into such language.  The translation shall be certified by an official or sworn translator or by a diplomatic or consular agent.

When initially filing the Petition with this court, petitioners did not comply with any of the three requirements of Article IV.  They did not attach a duly authenticated original or certified copy of the award; they did not provide the original or certified copy of the agreement of arbitrability between petitioners and Brighton Industries; and the translation of the award was not certified by an official or sworn translator, or by a diplomatic or consular agent.

In response to Kung's motion, petitioners have now submitted both the original of the agreement of arbitrability and a translation of the arbitration award.  Petitioners' Response Memo, Ex 2; Baolin Chen's Affidavit, Ex 6.  Nevertheless, Kung argues that these submissions are too late and too little, requiring dismissal.

//

//

**A.** **Tardiness of Submissions**

Kung contends that all documents set forth in Article IV must be submitted when the Petition is filed. The language of Article IV is indeed mandatory. However, nothing in the Convention states the lack of required documentation is jurisdictional. Here, the deficiencies in the required documentation under Article IV are merely technical and capable of being corrected at a later date without causing prejudice to the defendant. At least one other court has concluded that this type of defect can be cured.

> The alleged "jurisdictional" grounds were failure to attach the authenticated original or a certified copy of the award, and changed political conditions in Ethiopia which BFC claimed had dissipated the power of plaintiff counsel to act for the Ethiopian state. We pretermit the validity of these objections since Ethiopia cured both.

*Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F2d 334, 336 n4 (5th Cir 1976).

This situation is similar to allowing an amendment to a timely filed fee application under the Equal Access to Justice Act, 28 USC § 2412(d) ("EAJA"), to add the essential allegation that the government's position was not substantially justified. *Scarborough v. Prinicipi*, 541 US 401, 414 (2004). Instead of involving subject matter jurisdiction, the EAJA addresses "a mode of relief (costs including legal fees) ancillary to the judgment of a court that has plenary 'jurisdiction of [the civil] action' in which the fee application is made." *Id* at 413 (citation omitted). Just as the relation-back doctrine applies to fee applications under the EAJA, a deficient Petition to confirm an arbitration award may be amended under Federal Rule of Civil Procedure 15 and relate back to the date of the initial filing.

The allegations in the Petition were sufficient to put respondents on notice of the nature of the claim, and the Petition attached a copy of the arbitration award in Chinese, as well as an unsworn English translation. Any deficiencies were not material and now have been corrected.

B. **Translation of Award**

Kung also finds fault with the translation of the arbitration award made by Shawa Mu, a member of the law firm representing petitioners, who certified the accuracy of the translation in front of an Oregon notary public. Although Article IV allows a translation by a "sworn translator," Kung contends that a translation by an interested party who is not an official translator is insufficient.

This court disagrees. According to her sworn Certificate of Accuracy, Shawa Mu certifies that she is familiar with both the English and Chinese languages; that she is an attorney authorized to practice law in Oregon; and that her translation is "true and complete." Although she may be a member of the law firm representing petitioners, her ethical obligation as an attorney provides satisfactory assurance that her translation and certification are accurate. Translation need not be her primary business since Article IV contemplates that a translator may either be "official" or "sworn," not both. Furthermore, although Kung has repeatedly complained that the translation is inaccurate, he has never pointed out how it is inaccurate. Therefore, this court finds a notarized certificate of accuracy by a translator complies with Article IV(2).

Moreover, petitioners cured any objection by filing a new translation on December 20, 2005, with a sworn Certificate of Accuracy by a translator "by occupation" for 20 years who is a member of the American Translators Association and unrelated to petitioners' law firm.

///

## C.  Lack of Signed Arbitration Agreement

The original agreement submitted by petitioners contains an arbitration clause, but Kung was not a party to that agreement.  Relying on *Czarina v. W.F. Poe Syndicate*, 358 F3d 1286, 1292 (11th Cir 2004), Kung argues that the petitioners' failure to file an agreement containing an arbitration clause signed by him requires dismissal of the Petition.  According to *Czarina*,  "the party seeking confirmation of an award falling under the Convention must meet article IV's prerequisites to establish the district court's subject matter jurisdiction to confirm the award." *Id.* *Czarina* noted that the language of Article IV refers back to the agreement described in Article II. Article II states in relevant part that:  "The term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegram."  In *Czarina*, the parties submitted four forms to evidence the debt under a reinsurance agreement.  Only the fourth form contained an arbitration clause, but it was an unsigned, unexecuted sample.  The court found this form was insufficient to satisfy the agreement-in-writing prerequisite and dismissed the case for lack of jurisdiction.

In contrast, petitioners have submitted a written agreement with an arbitration clause. This satisfies the procedural requirements of Article II.  The issue is whether Kung, a non-signator to the agreement, is bound by that arbitration clause.  Even if he did not sign the agreement with the arbitration clause, he may still be bound by an arbitration agreement arising out of common law principles of contract and agency law, such as incorporation by reference, assumption, agency, piercing the corporate veil/alter ego, and estoppel.  *Smith/Enron Cogeneration Ltd. P'ship*, 198 F3d 88, 97 (2nd Cir 1989), *cert denied* 531 US 815 (2000), citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F3d 773, 776 (2nd Cir 1995); *see also Legacy*

*Wireless Serv., Inc. v. Human Capital, LLC,* 314 F Supp 2d 1045, 1053-54 (D Or 2004), citing

*Smith/Enron* with approval; *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr*, 311

F3d 488, 495 (2nd Cir 2002); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,

206 F3d 411, 417 (4th Cir 2000); *Thomson-CSF,* 64 F3d at 777 ("Traditional principles of agency

law may bind a nonsignatory to an arbitration agreement.").

The situation presented by this case is similar to that in *Sarhank Group v. Oracle Corp.*,

404 F3d 657, 660 (2nd Cir 2005), which distinguished *Czarina* and also rejected its holding as

inconsistent with Supreme Court and Second Circuit authority.  In *Sarhank*, Oracle did not sign

the agreement containing an arbitration clause; instead, the agreement was signed by a shell

corporation.  As a result, when Sarhank petitioned the court to enforce the foreign arbitration

award against Oracle, Oracle argued that the court lacked subject matter jurisdiction.  The

Second Circuit disagreed, finding that for subject matter jurisdiction purposes, Sarhank had

adequately pleaded an arbitral award falling under the Convention by describing the legal

relationship between Oracle and the shell corporation which signed the arbitration agreement.

That gave the court subject matter jurisdiction "to resolve the legal and factual questions

ancillary to determining whether the Egyptian award could be enforced in the United States

against Oracle.  These questions are merits questions, not subject matter jurisdiction questions."

*Id*.  Under general principles of contract law, courts look at whether "the totality of the evidence

supports an objective intention to agree to arbitrate."  *Id* at 662.

In *China MinMetals Materials Import and Export Co., LTD. v. Chi Mei Corp.*, 334 F3d

274, 286 (3rd Cir 2003), analyzing the interplay between the "agreement in writing" requirement

of Article II and the narrow defenses available under Article V of the Convention, the court

found that the "absence of any reference to a valid written agreement to arbitrate in Article V does not foreclose a defense to enforcement on the grounds that there never was a valid agreement to arbitrate." As a result, the district court had authority under the Convention to determine the validity of the arbitration agreement which one party claimed to be a forgery.

To satisfy Article II of the Convention, petitioners have provided the original of the purchase contract with Brighton Industries containing the arbitration provision. Petitioners allege that Kung signed the Refund Agreement which related to that purchase contact. On that basis, CIETAC issued an arbitration award against Kung. In their briefing, petitioners have expanded on these allegations by stating that Kung consented to arbitration, either as an alter ego of Brighton Industries and Brighton Technologies or through estoppel.

Whether Kung may be bound by the arbitration clause under principles of contract and agency depends on the totality of the facts, which necessitates further discovery and an evidentiary hearing. As a result, that issue cannot be resolved at this early juncture on a motion to dismiss.

### D. <u>Untimely Filing</u>

Although not argued in his motion, Kung contended during oral argument that the Petition was not filed "within three years after an arbitral award falling under the Convention is made," as required by 9 USC § 207. The arbitration award is dated March 11, 2002, and the Petition in this case was filed March 11, 2005. According to FRCP 6, "the day of the act, event, or default from which the designated period of time begins to run shall not be included." Because the Petition was filed with three years after the arbitration award was issued, it is timely.

///

## RECOMMENDATION

For the reasons set forth above, respondent Kit Kung's Motion to Dismiss (docket #17) should be GRANTED on the basis that this court lacks personal jurisdiction. Accordingly, respondent Kit Kung should be dismissed from this action with prejudice.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due January 23, 2006. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 3rd day of January, 2006.


s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge